## CARR et al. v. MAXON.

(Circuit Court of Appeals, Seventh Circuit. March 30, 1923. Rehearing Denied June 12, 1923.)

No. 3158.

Patents ☞328—1,203,482 and 1,204,245, for concrete road-tamping machines, held valid and infringed.

The Carr patents, No. 1,203,482 and No. 1,204,245, both for concrete road tampers, the latter being for an improved machine, which carries also a strike for leveling the roadway ready for tamping held not anticipated, valid, and infringed.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Suit in equity by Edward G. Carr and the Lakewood Engineering Company against Glenway Maxon, Jr. Decree for defendant, and complainants appeal. Reversed.

F. E. Dennett, of Milwaukee, Wis., for appellants.
Louis O. French, of Milwaukee, Wis., for appellee.

Before BAKER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. The District Court dismissed appellants' bill, charging infringement of claims 1, 2, 3, and 5 of Carr patent No. 1,203,482, herein called Carr 1, and claims 2, 3, 6, 7, and 13 of Carr patent No. 1,204,245, herein called Carr 2, both on concrete tampers. The defenses were noninfringement and prior use and invention.

In building concrete roads concrete, made of cement, water, sand, and crushed stone, or gravel, is dumped upon a prepared roadbed between steel or wood forms, that hold the sides of the way to be concreted. The road is crowned along its longitudinal center and slopes each way to the top of the forms. In mixing the concrete, the quantity of water varies greatly, but the best results are obtained where little water is used. After dumping the concrete, it has to be spread, and then tamped.

In 1914, Carr 1 was applied for. Roughly speaking, it consisted of an axle, that extended across the road, with wheels on either end, run-

ning upon the forms. A tamping bar, extending clear across the road, was carried a short distance in front of the wheels on two handles, one of which was attached to each end of the axle and extended a considerable distance forward. Through those handles, men moved the machine upon the work. The tamping bar was operated up and down by the mechanism of a gasoline engine, carried on the tamping bar frame.

In 1915, Carr 2 was applied for. It consisted of a carriage having four wheels, moving upon the side forms under its own power. The frame carried two templets, or bars, extending clear across the roadway. The one, in this record called the "strike," had imparted to it by the machinery the horizontal motion which made the "strike-off" or leveling of the concrete ready for tamping. The other templet, also operated by the machinery, was the tamper and had a vertical movement.

A machine combining the elements of both these patents came into general use in nearly every state in the Union, and many hundreds of them have been sold. In 1920, appellee, a former employee of Carr, made the machine complained of and put it in use.

Appellee's description of his machine shows clearly that there is no substantial difference between it and appellants' machine. The chief claim of difference is that, whereas, appellants' tamper has a quick up-and-down motion, the tamper in appellee's machine drops until it comes in contact with the road, and, as the piston comes up in the cylinder, the pressure is built up and forces down the tamper until it reaches the limit of its strike, which is the top of the forms. By this alleged operation, it is urged that appellee escapes infringement of the vibratory element in appellants' claims.

Appellee's illustration of its tamper operation shows two vertical cylinders connected by an air passage near the top. In each is a piston, working up and down from the bottom, one connected to the tamper, and the other by its rod to the crank shaft of the engine, geared, as claimed, to about 100 revolutions per minute. As the piston attached to the crank shaft moves up in the cylinder, the compressed air flows into the other cylinder, and, impacting with the piston head there, forces the tamper down onto the concrete. As the piston on the crank shaft moves downward, a vacuum is created in the cylinder above the tamper piston, and the tamper is raised. As the whole movement is made by the regular, uninterrupted motion of the engine, transmitted through its crank shaft and the piston attached thereto, the movement of the tamper must have the same regularity, and cannot go down slowly and come up quickly, as claimed. There is no difference between the operation of the tampers in the two machines, and we are of opinion that infringement is clearly shown.

The record shows that a strike-off device, commonly called a "strike," and a tamper, operated by hand, were in use as early as 1912. The concrete was placed between the wood or steel side forms and leveled by men using shovels. The "strike," which was 18 inches longer than the width of the road, was made of one or more heavy planks, sometimes with handles on each end, with one edge of the planks cut so as

to form the desired crown of the pavement. Sometimes one instrument was used both for the strike-off and for tamping, but when a separate tamper was used it was sometimes made of two 10-inch planks, spaced 10 inches apart and cut to the same crown as the "strike," with an iron or steel plate on the bottom side to take care of the wear. The "strike" was operated by a man on each end moving it backward and forward on the forms, across the road, and also longitudinally with the road and away from the finished part, so as to strike off or level the concrete before it was tamped. The "strike" weighed as much as 300 pounds. The tamper was not moved across the road, but was only moved forward. In tamping, one end at a time was lifted and dropped, or forced, down onto the concrete.

The photographs in the record show that a great deal of water was used in the concrete under the hand method; also, that it was very slow and hard work. It appears that appellants' machine can move as much as 7 feet per minute, and that concrete with comparatively little water in it can be struck off by the machine, that is too stiff to be struck off by the hand method. Obviously, one man, raising and lowering one end of a 300-pound "strike," would not get either the rapid or the sustained results accomplished by the machine.

There is another marked difference between the hand method and the machine. In the machine the "strike" is placed and operated across and slightly above the roadbed, which, at the edges, is the top of the forms, so that, in tamping, the concrete can be forced down to the top of the rails or forms. In the hand method, because the "strike" is moved upon the forms, the strike-off necessarily is no° higher than the top of the forms. It is clear that not much effective tamping can be done where the strike-off is already down to the top of the forms, below which the tamper cannot go. We are of opinion that the Carr inventions marked a very considerable advancement in the art over the hand method.

The following patented inventions are relied upon as anticipating appellants':

The Carson invention of 1893 shows an elaborate paving machine, supported upon a roller at the rear and upon wheels in front. The roller rests and moves upon the pavement, when laid. The front wheels, being upon an axle shorter than the roller, must move upon something undisclosed within the side lines and ahead of the pavement. The paving material is carried by an endless screw into a large circular trough, around the inner edge of which is a cogwheel, resembling the master wheel of an old-fashioned horse power. The trough is rotated in a horizontal plane, and the material is dumped upon the roadway through the opening and closing of gates in the bottom of the trough. The material is spread by a rake, tamped by a postlike tamper, heated from a fire box, rolled by a roller, all hung upon and rotating with the trough. If it is desired to crown the pavement, the inventor says two machines, to be operated side by side, are necessary. There are many ways in which appellants' machine is different from the Carson machine. The rake, which appellee likens to the "strike" in appellants' machine in its operations, does not extend across the road, nor make

a crown in the pavement. The tamper in the Carson machine does not extend across the road.

The Hewitt cement-spreading machine, No. 893,168, may be disposed of, so far as this case is concerned, by quoting the following from its specifications:

"The essential feature of the machine consists of a heavy drag beam loosely hung by means of chains from a truck frame carried by flanged wheels on a light track."

The German patent of Timmermans, No. 254,894, if in any way like appellants' machine, is obviously lacking in the elements of appellants' combination.

In the Huntington street-paving machine, No. 452,184, there is nothing resembling the "strike" in appellants' machine. It does not run upon tracks with the tamper the full width of the road, but that which is the tamper in the Huntington machine is called a rammer and is described as a rectangular block, secured on the end of a vertical piston rod of a steam cylinder. The rammer is worked over the surface of the road as the whole machine is moved about from place to place.

The Keables road-making machine, No. 1,060,604, is complicated. It has a plurality of postlike tampers that strike one after the other. There is what may be called a strike-off member, referred to, but not described. Neither the "strike" nor the tampers extends across the road, and neither in operation conforms to the crown of the road.

When Carr came into the field, prior to 1914, it was occupied by practically nothing except the hand "strike" and tamper, hereinabove described. There had been patented in 1891 the Huntington device, in 1893 the Carson, in 1908 the Hewitt, and in 1913 the Keables. They occupied the field only to the extent as disclosed in the patents, the devices never having been made or used. From the description of the hand method of using the "strike" and the tamper, the field was open to Carr to make a mechanically operated tamper that could do more work and more efficient tamping. The evidence showed that a rapid vibratory movement of the tamper would work more water out of the concrete, compact it more, and make a better roadbed. This field the claims in suit in Carr 1 attempted to, and in our opinion did, cover. It will be remembered that in the old hand method the "strike" was not raised, but was moved along the top of the forms, so that the tamper had little or nothing to work upon. In claims 1, 2, and 3 of Carr 1 one of the elements is a suspension of the frame slightly above the roadbed. This made it possible to do what could not be done by the old hand method. The strike-off leaves the concrete above the top of the forms and gives greater opportunity of compacting the concrete and working out the water. So far as the field was occupied by the old hand method, that was open to Carr. The Huntington invention left the field open to Carr to make a combination of a "strike" and a tamper that would cover the whole width of the roadway and form the crown of the road, as required, as the "strike" and the tamper did their work. The field was left similarly open by the Carson invention and the Keables.

Every claim involved is a combination claim, covering what proved in use to be a practical road-building machine. While the construction that produces the vibratory movement in the tamper, following the teaching of Carr 1, is an advancement and is beneficial in the successful laying of concrete, we are of opinion that the claims should not be so narrowly construed as to designate that as the only element of advancement. Even if, as claimed by appellee, his machine does not infringe that element, in which we do not concur, appellee cannot for that reason escape the charge of infringing appellants' patents.

The claims of both Carr patents are valid and infringed, and the decree is reversed, with the direction to enter a decree for an injunction and accounting.